Filed 5/11/26  P. v. Moqaddem CA2/7

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>MAHA MOQADDEM,<br><br>    Defendant and Appellant. | B336791<br><br>(Los Angeles County<br> Super. Ct.<br> No. XWESA098438) |

APPEALS from a judgment and an order of the Superior Court of Los Angeles County, Joseph J. Burghardt, Judge. Affirmed.

Law Offices of George E. Murphy and George E. Murphy for Defendant and Appellant.

Rob Bonta, Attorney General, Charles G. Ragland, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Noah P. Hill and Steven E. Mercer, Deputy Attorneys General, for Plaintiff and Respondent.

# INTRODUCTION

Maha Moqaddem attacked her husband, Albert Gregory Pinto, hitting him several times in his eyes, knowing Pinto had a history of medical problems with his eyes. She damaged one of his eyes so badly he lost all vision in that eye.

A jury convicted Moqaddem of various crimes, including aggravated mayhem, willfully inflicting corporal injury on a spouse, and after she contacted Pinto in violation of a criminal protective order and offered him $20,000 not to testify against her, attempting to bribe a witness and dissuade him from testifying. The trial court sentenced Moqaddem to a prison term of two years, plus life with the possibility of parole. Moqaddem appeals from the judgment, but through her retained appellate counsel does not make any preserved, cogent, or supported arguments. Therefore, we affirm.

# FACTUAL AND PROCEDURAL BACKGROUND[1]

## A. *Moqaddem and Pinto Meet, Marry, and Argue*

Pinto and Moqaddem met in July 2017, began dating the next month, became engaged in March 2018, and married in April 2018. They lived in Santa Monica.[2] Before they were married Pinto could see out of both eyes.

---

[1]    We summarize the facts, as we must, in the light most favorable to the judgment. (*People v. Reyes* (2023) 14 Cal.5th 981, 988.)

[2]    Moqaddem testified she never dated, became engaged to, married, or lived with Pinto. She stated that Pinto, an attorney,

2

But, as Moqaddem learned, Pinto had a history of eye problems. As a teenager he had a cornea condition called keratoconus, where the fibers around the eye weaken and begin to break, which creates pressure inside the eye, causes the cornea to bulge, and distorts the image the eye sees. Pinto had surgery to insert corneal transplants in both eyes. An ophthalmologic surgeon replaced the central portion of Pinto's corneas with donor corneas, which gave Pinto smooth corneal surfaces that refracted light properly.

Moqaddem knew Pinto's history of eye issues. In May 2018 Pinto and Moqaddem visited Pinto's mother in Las Vegas. Pinto's mother told Moqaddem about her son's "history with his eyes and the cornea transplants he had . . . as a teenager." Pinto's mother wanted Moqaddem to know her son had sensitive eyes because, several weeks before Pinto and Moqaddem went to Las Vegas, Pinto's mother had observed Pinto's right eye was red and swollen. Moqaddem said Pinto had already told her that he had the cornea transplants and that his eyes were sensitive.

The morning after this conversation Moqaddem woke up angry, got out of bed, and hit Pinto in the face and eyes. One of her swings "connected" with Pinto's right eye.[3] Pinto's right eye became red and swollen, and he had scratches on his face and arms. Moqaddem was screaming, cursing, and saying she was going to blind Pinto. Pinto begged her not to hit him in the eye. Moqaddem stopped hitting Pinto when his mother came into the

---

represented her in several legal matters and that he forced her to have sex with him.

[3] Moqaddem denied hitting Pinto that day. She testified Pinto attacked her.

room and saw Pinto's right eye was bloody and swollen. Pinto's mother told Moqaddem that Pinto would need a transplant and called security. Security guards took Moqaddem away.[4]

Pinto sought medical attention for the injury to his eye from the same doctor who had treated him as a teenager. Moqaddem accompanied Pinto because she wanted to make sure Pinto did not tell the doctor how he sustained the injury. With Moqaddem present the doctor examined Pinto's eye and found he had a bruise on the outside of his eye and a vitreous detachment.[5]

B. *Moqaddem Hits Pinto in the Eye Again and Blinds Him*

On July 11, 2018, a few months after they married, Pinto and Moqaddem had lunch together at a Mexican restaurant in

---

[4] This was not the first incident of domestic violence. On April 17, 2018, just before Pinto and Moqaddem were married, police responded to a domestic disturbance at their Santa Monica residence. Moqaddem had hit Pinto while he was sleeping. Pinto ran downstairs, and Moqaddem following him, screaming and swinging at him. She hit him in the ears and scratched his face and neck. Officers observed "fresh scratches" on Pinto's forehead, neck, and upper back, and they arrested Moqaddem. When asked why he married Moqaddem a week after this incident, Pinto said, "I loved her. I don't know. Clearly it wasn't the best choice." Moqaddem testified that Pinto attacked her that evening and that he physically assaulted her "many times."

[5] Moqaddem admitted she was present at Pinto's visit with his eye doctor in May 2018 and said Pinto "made up something about his right eye." Moqaddem stated that Pinto had damage to his left eye before they met and that his eye doctors deleted medical records and later entered "new information."

Los Angeles. Later that afternoon they went to meet some of Moqaddem's friends and family members at a hotel in Beverly Hills. After a few hours Pinto left to meet a real estate agent at a restaurant to discuss houses in Washington, DC Pinto and Moqaddem were considering buying. Pinto drove to the restaurant to meet the real estate agent; Moqaddem stayed at the hotel with her family and friends.[6] One of the members of the group at the hotel called Pinto and said they would meet him at the restaurant. Pinto waited at the restaurant until it closed, but no one came. Pinto left the restaurant and went home. When he arrived he found the house empty, went upstairs, and fell asleep on a couch next to the bed.

Approximately 30 minutes later, Pinto heard loud knocking at the door. He went downstairs, thinking it might be Moqaddem, and opened the door. Moqaddem yelled and cursed at him and said she did not have her keys. Moqaddem was standing two feet from Pinto screaming obscenities when he turned his head toward the stairs and indicated he was going to bed. Moqaddem hit him four times in rapid succession, "full extension," twice in each eye, either in the eyelid, eye socket, or the temple by his eye. Pinto put his hands up and said, "Stop. You're gonna blind me. You know I had surgeries. You know you could blind me. We talked about this before. Stop. Stop." Moqaddem stopped, and Pinto put down his arm. Moqaddem hit Pinto two more times: One strike was in his right eye and "hit the bone"; the other was "an absolute bullseye connection with [his] left eye."

---

[6] Moqaddem testified Pinto took her car from the hotel without her permission.

Pinto "saw stars, just like a cartoon," and "everything in [his] head went to a hollow thud sound." He felt his left eye "bouncing back in [his] head." Pinto fell to one knee, put his hand to his face, and felt his eye "start to goo out" between his fingers. He was unsure whether it was blood or pieces of his eye coming out. Pinto testified: "It felt like if you were making meatballs and you were trying to squeeze them and hold them in while you're trying to squeeze them hard, and the blood and the bits are trying to squeeze through the areas of your fingers where you're trying to hold them together." His eye felt "warm and gooey, like you dinged the inside of your eye or brain." Pinto did not take his hand away from his eye because he did not want his eye to "squirt out on the ground," so he asked Moqaddem to bring him a towel.

Pinto wrapped the towel around his hand and used it to keep pressure on his eye. He could feel his eye "oozing out" and wanted to make sure he caught any pieces of his eye to take with him to the hospital. Pinto stated: "I didn't want to lose pieces of my eye. So if they could find it in the goo mess, they could possibly repair it." Pinto asked Moqaddem to take him to the same hospital where he had received the corneal transplants. After initially resisting and saying Pinto's eye was fine, Moqaddem drove him to the hospital and dropped him at the emergency room.[7]

---

[7] Moqaddem testified she walked into the residence and was looking for her keys upstairs, when she heard Pinto say, "Oh, my God." She stated she came downstairs and saw him sitting on a bench with a towel in his hand. She denied she hit Pinto in the head or the eyes. She stated that Pinto's dog may have scratched

Doctors and nurses treated Pinto in the emergency room. When they asked Pinto what happened to his eye, he said his wife hit him. The doctors and nurses put bandages on him, placed him in a dark room, and later performed emergency surgery on his eye.[8] Pinto remained in the hospital for several days.

Pinto lost all vision in his left eye. Pinto learned in follow-up visits with doctors that he would not regain sight in his left eye and that it was "essentially dead." The blows from Moqaddem had ruptured the incision site of the prior surgery, and the contents of his eye had come out through the hole. Pinto's eye was "shrunken," "deformed," "depressed," and had an "opaque cornea." His doctor used the term "phthisis bulbi," which means "ophthalmic death." The doctor told Pinto nothing could be done for his eye and discussed with Pinto the possibility of a prosthetic.

Pinto eventually went to a "cosmetic optic" doctor to get an ocular prothesis for his eye. He received a prosthetic cap that fits over the remnants of his eye. The cap replaces the parts of the eye that are missing and moves "a little more naturally than a full prosthetic eye."[9]

---

him or that "neurotic plants" got into Pinto's eye and caused his injury.

[8] Moqaddem testified that Pinto's eyes were "completely normal" at the hospital and that "there was nothing wrong" with them.
[9] Pinto did not have the prosthetic cap in his eye at trial and was able to show it to the jury.

C.    *The People Charge Moqaddem with Several Crimes*

Police arrested Moqaddem in the hospital valet parking area outside the emergency room.  The People charged her with mayhem (Pen. Code, § 203)[10] and willfully inflicting corporal injury on a spouse (§ 273.5, subd. (a)).  The People alleged Moqaddem personally inflicted great bodily injury under circumstances involving domestic violence, within the meaning of section 12022.7, subdivision (e).

D.    *Moqaddem Violates a Criminal Protective Order*

On July 16, 2018 Moqaddem was served in court with a criminal protective order requiring her, among other things, not to have any contact with Pinto.  The order also required her to stay at least 100 yards away from Pinto and to stay away from their Santa Monica residence.

Moqaddem did not comply with the criminal protective order.  In April and May 2021 she called Pinto from custody using different phone numbers and sent him emails asking him to help her with certain documents.  Pinto also visited Moqaddem in jail 10 to 12 times, "pretty much every time she asked."[11]  When at one point the criminal case was about to go to trial, Moqaddem suggested to Pinto that "she wanted to work something out with

---

[10]    Statutory references are to the Penal Code.

[11]    Pinto explained:  "I still cared about her.  I still didn't understand what happened and why.  I still missed her.  I still hoped that she would acknowledge what she did and apologize and maybe we could do something to help her move on and make things better.  I really was at a loss.  I didn't know either what I wanted or what to do."

[him] regarding the trial."[12]  Moqaddem said she could do something for him, and he could do something for her.  Pinto thought Moqaddem was asking him to "change the facts for her" or "refuse to testify in the coming trial."  He stated she wanted him "to recant anything that was in the police report or the hospital report or anything that was in any of the incident reports that had anything to do with this case."  Moqaddem ultimately offered Pinto $20,000 to say that she never hit him and that he made it all up.[13]  She also threatened Pinto by saying that she and others would hurt him and his family and that she would post a sex video of him on social media.

E.    *The People Charge Moqaddem with Additional Crimes*

The People charged Moqaddem with four more crimes.  The People charged her in an amended information with attempting to prevent or dissuade another person who has been the victim of a crime or who is witness to a crime from assisting in the prosecution of a crime (§ 136.1, subd. (a)(2)); offering or promising to give to any witness or person about to be called as a witness, any bribe upon any understanding or agreement the person will not attend upon any trial or other judicial proceeding (§ 138, subd. (a)); and intentionally and knowingly violating a protective order (§ 273.6, subd. (a)).  The People also added a charge of aggravated mayhem: unlawfully, under circumstances

---

[12]    Pinto began recording some of these calls, and the People played them for the jury.

[13]    Moqaddem admitted she offered Pinto $20,000 not to testify, but said she was being sarcastic.

9

manifesting extreme indifference to the physical or psychological well-being of another person, and intentionally causing permanent disability or disfigurement of another human being or depriving a human being of a limb, organ, or member of his or her body (§ 205).

F. *The Jury Convicts Moqaddem on All Charges, and the Trial Court Sentences Her*

The jury convicted Moqaddem on all six counts and found true the allegation she inflicted great bodily injury. On Moqaddem's aggravated mayhem conviction the court imposed a prison term of life with the possibility of parole. The court also imposed a prison term of two years on her conviction for bribing a witness. The court imposed concurrent or stayed terms, or both, on Moqaddem's other convictions. The court also ordered Moqaddem to pay victim restitution in an amount to be determined.

After a restitution hearing at which Pinto testified, the court ordered Moqaddem to pay $188,057.86 in victim restitution and $70,000 to the California Victim Compensation Board. Moqaddem timely appealed from the judgment of conviction, the trial court's oral restitution order, and the court's written restitution order. We consolidated the appeals.

**DISCUSSION**

Moqaddem's briefs, filed by retained counsel George Murphy (who represented Moqaddem in the trial court from May 2022 to March 2023), are a little hard to follow. For example, Moqaddem argues that the cases against her "involve

10

absolute false allegations, exaggerated charges, that . . . involve the prior Divorce attorney Albert G Pinto, that he formed for financial gain," and that "[t]his case involves absolute Extrinsic Fraud by depriving and blocking [Moqaddem] from her day in court, who was totally blocked from presenting her overwhelming evidence against Pinto . . . ." She argues: "On the face of this court transcript from this Preliminary Hearing. That will be demonstrated from various Exhibits to court of Appeal, with the clear sole intent to set up [Moqaddem] right from the start in the most horrific ways, from one plot to another, at every step, to find illegal and unjust ways to keep [Moqaddem] hostage at detention facilities from documented evidence." She contends: "The total mess in this case is unheard of before." Moqaddem cites no statutes, cases (with one exception), or other authority, nor does she provide any citations to the large record in this case.

We have done our best to try to understand Moqaddem's arguments. As best as we can determine, she appears to be making five arguments: (1) the People should not have added the charge of aggravated mayhem; (2) one or more of the various attorneys who represented her at trial (other than Murphy) provided ineffective assistance of counsel; (3) there was an irregularity in the jury selection process; (4) the trial court erred in sentencing her; and (5) the restitution award was improper. Moqaddem's arguments are all forfeited and meritless.

A. *Moqaddem Has Not Shown the Aggravated Mayhem Charge Was Improperly Added*

Moqaddem asserts the "core issue of this entire case is the improper adding of PC 205 to [this] case . . ., just two weeks after [she] was released from serving 4 years jail time because of this

11

case, at a hearing that took place on January 17, 2020 (See court transcript in the records) . . . ." She argues her attorney at the time, H. Russell Halpern, "failed to file proper motions and appeals to vacate such order adding this charge that was added without a Preliminary hearing independent Judge nor a Grand Jury approving of this outrageous and totally unjustified high charge."

What Moqaddem and her attorney Murphy appear to be challenging is the People's decision to add a count in the amended information for aggravated mayhem under section 205, though that did not occur on January 17, 2020. The People filed an amended information on December 4, 2019 that added a charge of aggravated mayhem under section 205, in addition to simple mayhem under section 203, and the court and counsel discussed the amendment at a hearing on January 6, 2020. The People eventually filed a second amended information on July 21, 2022 that included aggravated mayhem, as well as the new counts for attempting to dissuade Pinto from testifying, attempting to bribe him, and violating the protective order. Moqaddem's court-appointed attorney at the time, Jason Feldman, waived reading of, and arraignment on, the new charges, and pleaded not guilty for Moqaddem.

Moqaddem forfeited any contention it was improper for the People to add the count of aggravated mayhem. She does not present any cogent argument or citation to legal authority for her contention. (See *People v. Williams* (1997) 16 Cal.4th 153, 206 ["Points 'perfunctorily asserted without argument in support' are not properly raised."]; *People v. Stanley* (1995) 10 Cal.4th 764, 793 ["'[E]very brief should contain a legal argument with citation of authorities on the points made. If none is furnished on a

particular point, the court may treat it as waived, and pass it without consideration.'"]; *People v. Hardy* (1992) 2 Cal.4th 86, 150 [defendant forfeited an argument by failing to "expand on the issue with either argument or citation to relevant authority"]; *People v. Lewis* (2025) 111 Cal.App.5th 1078, 1098 ["absence of cogent legal argument" forfeits the issue on appeal]; *People v. Benson* (2025) 110 Cal.App.5th 1068, 1078, fn. 2 ["'"[T]o demonstrate error, an appellant must supply the reviewing court with some cogent argument supported by legal analysis and citation to the record."'"]; *People v. Ramirez* (2024) 104 Cal.App.5th 315, 329-330 [defendant forfeited an argument by not citing "any relevant legal authority to support this claim" or "develop[ing] a cogent legal argument"]; *People v. Clayburg* (2012) 211 Cal.App.4th 86, 93 [failure to present "reasoned argument and analysis" forfeits issue on appeal]; *People v. Roberto V.* (2001) 93 Cal.App.4th 1350, 1364, fn. 6 [failure "to provide any substantial argument or citation to authority to support [the defendant's] contention" forfeited the argument]; *People v. Beltran* (2000) 82 Cal.App.4th 693, 697, fn. 5 [assertion "without discussion, citation to authority or citation to the record" is forfeited].)

Moqaddem also forfeited any such contention by failing to cite to the record. (See *People v. Hoyt* (2020) 8 Cal.5th 892, 939 ["by failing to support his appellate arguments with record citations, defendant has forfeited any claim of error on appeal"]; *People v. Weber* (2013) 217 Cal.App.4th 1041, 1055 [defendant forfeited an argument by failing to provide a record citation for a statement he claimed occurred during the trial]; *People v. Johnigan* (2011) 196 Cal.App.4th 1084, 1098 ["Absent citation to the record, the alleged error is without foundation and

forfeited."]; *People v. Mendoza* (1986) 183 Cal.App.3d 390, 398 ["'[A] point suggested on appeal cannot be considered where the brief fails . . . to point out the page of the record where the alleged error is supposed to have occurred.'"]; *People v. Nobles* (1941) 44 Cal.App.2d 422, 425 [defendant forfeited claim of error where he cited "no page of the record where this asserted error occurred"].)  Murphy's brief contains no citations to the record.

As the court stated in *People ex rel. Reisig v. Acuna* (2017) 9 Cal.App.5th 1, in words equally applicable to this case:  "'[T]he trial court's judgment is presumed to be correct, and the appellant has the burden to prove otherwise by presenting legal authority on each point made and factual analysis, supported by appropriate citations to the material facts in the record; otherwise, the argument may be deemed forfeited.  [Citations.]  [¶]  It is the appellant's responsibility to support claims of error with citation and authority; this court is not obligated to perform that function on the appellant's behalf.  [Citation.]  [¶]  . . . And the appellant must present each point separately in the opening brief under an appropriate heading, showing the nature of the question to be presented and the point to be made; otherwise, the point will be forfeited.  [Citations.]  This rule is "designed to lighten the labors of the appellate tribunals by requiring the litigants to present their cause systematically and so arranged that those upon whom the duty devolves of ascertaining the rule of law to apply may be advised, as they read, of the exact question under consideration, instead of being compelled to extricate it from the mass."'"  (*Id.* at p. 25; see *Jones v. Superior Court* (1994) 26 Cal.App.4th 92, 99 ["[i]ssues do not have a life of their own: if they are not raised or supported by argument or citation to authority," they are forfeited].)

14

But even if Moqaddem had not forfeited it, her contention is meritless. There was no error in amending the information to add a count of aggravated mayhem. "'Under section 739, "the law is settled that unless the magistrate makes factual findings to the contrary, the prosecution may amend the information after the preliminary hearing to charge any offense shown by the evidence adduced at the preliminary hearing provided the new crime is transactionally related to the crimes for which the defendant has previously been held to answer." [Citations.] "Under the case law interpreting section 1009, the test applied is whether or not the amendment changes the offense charged to one not shown by the evidence taken at the preliminary examination. [Citation.]" [Citation.] As long as the above standards are met, there is no bar to adding to the information enhancement allegations that were not charged in the complaint.'" (*People v. McCoy* (2013) 215 Cal.App.4th 1510, 1531; accord, *People v. Terry* (2005) 127 Cal.App.4th 750, 766; see § 1009 ["An indictment or accusation cannot be amended so as to change the offense charged, nor an information so as to charge an offense not shown by the evidence taken at the preliminary examination."]; *People v. Fugit* (2023) 88 Cal.App.5th 981, 993 ["a trial court may permit amendment of the information "'at any stage of the proceeding, up to and including the close of trial,'" if the defendant's substantial rights are not violated (unless the new offense is not supported by evidence at the preliminary hearing)"]; *People v. Winters* (1990) 221 Cal.App.3d 997, 1005 ["Section 1009 authorizes amendment of an information at any stage of the proceedings provided the amendment does not change the offense charged in the original information to one not shown by the evidence taken at the preliminary examination."].)

The defendant's remedy is to challenge the amendment by filing a motion under section 995 to dismiss the new count. (*People v. Rogers* (2016) 245 Cal.App.4th 1353, 1361.)

The trial court (Judge Lauren Birnstein) explained this to Murphy, who practices "predominantly administrative law with the workers' compensation appeals board" but at the time was counsel of record for Moqaddem in her criminal case: "So let me explain to you what any reasonable criminal defense attorney would know. And that is that at the time the amendment was filed there need be no motion. They just filed the amended information, right? If you or any reasonably experienced criminal attorney at the time or anytime thereafter before trial—if you believe there was insufficient evidence at the preliminary hearing underneath to show all the elements of aggravated mayhem, then you have the right certainly to file a [motion under section] 995 on that very serious charge that they added. They can only add it if there was enough evidence at the preliminary hearing to have held your client to answer on the more serious charge. So you can file a [motion under section] 995 on all those issues that I have now delineated for you." Murphy said he would file a motion to dismiss the mayhem charge under section 995, but he never did.

On August 5, 2022 the trial court addressed the issues the court believed the People's amendment to add aggravated mayhem charge raised, even though Murphy had not filed a motion. The court stated: "So, if you had been doing your job appropriately, as you said you were going to be ready on a [motion under section] 995 today, I am going to address the issues for a 995. . . . If you still wish to write your own 995, you can present it . . ., but right now I'm going to address the issues

16

that I see with the aggravated mayhem." The court stated: "I want to hear the People's argument, because I think that the only issue on the aggravated mayhem is whether there was enough evidence at the preliminary hearing to show a specific intent to maim." The court read some of the testimony presented at the preliminary hearing, cited several cases, and stated that, "if the evidence shows no more than an indiscriminate attack, it's insufficient to prove the specific intent" required for aggravated mayhem.

The prosecutor responded the evidence showed that Moqaddem knew Pinto had eye conditions and prior surgeries and that she had previously attacked his eyes. The court stated: "So before I rule, Mr. Murphy, I will allow you to file a written [motion under section] 995, now that I've given you all the case law, now that you know what the issue is, on the aggravated mayhem. I want to see the defense. You said you wanted to file one and make the motion yourself. Go right ahead. And you can file a 995 [motion] anytime up until trial."[14] Murphy still did not

---

[14] The court (still Judge Birnstein) later stated: "I probably am going further than I should to help the defense in this case. I'm sure [the prosecutor] does not like the fact that I am giving you all the case law." The prosecutor stated: "I do not." The court stated: "So you have told me several times that you were going to file a 995 [motion]. You've made that statement on the record in court. But I have seen no paperwork." The court added: "I've also kind of pushed you to associate in or seek advice from an experienced criminal attorney. And again, I have said all along that is because I want your client to have the best defense possible, okay? So if you are associating with or seeking the advice of a criminal attorney, that might help you, okay?"

17

file a motion under section 995 to dismiss the aggravated mayhem charge. As stated, he never did.

It was not until after the court removed Murphy from representing Moqaddem that her court-appointed lawyer, Louis Sepe, made a motion under section 995 to the trial court (Judge Joseph Burghardt) to dismiss the aggravated mayhem charge on December 29, 2023.[15] Sepe argued: "The exceptionally limited evidence adduced at the preliminary hearing does not include any evidence to support the necessary element that [Moqaddem] acted with extreme indifference to the well being of the victim. Instead, it contains only evidence of the opposite, because it is undisputed that [Moqaddem] immediately drove the victim to the hospital and remained there and cooperated with the police . . . ."

---

[15]     In March 2023 the trial court (Judge Burghardt) removed Murphy as Moqaddem's attorney for refusing to be ready for trial and "to prevent disruption of the orderly processes of justice" under the "exceptional" circumstances of the case. The court found Murphy was unprepared, "not competently representing the defendant," had not retained an expert, was "not experienced in criminal law or in the rules of professional conduct," "stated in documents to the court that he won't obey the court's orders," "questioned the integrity of the court and questioned the integrity of pretty much every judicial officer in the . . . courthouse," made "unsubstantiated and baseless complaints against judicial assistants, against court reporters, pretty much everyone involved in the court system," and "sought many delays to get an advantage." The court removed Murphy as Moqaddem's attorney in the case and ordered a court-appointed lawyer to represent Moqaddem.* The court appointed Sepe to represent Moqaddem in September 2023, and Sepe filed a motion under section 995 two months later.

　　* Moqaddem does not challenge this ruling.

A person who drives a person to the hospital is not indifferent to that person's well-being, let alone extremely indifferent."

The trial court (Judge Burghardt) denied the motion to dismiss the aggravated mayhem count, citing evidence at the preliminary hearing that Moqaddem knew Pinto had surgeries on his eye and that she had previously attacked his eyes "knowing that one was weak." The court ruled: "The standard at a preliminary hearing is probable cause, and the court is permitted to make reasonable inferences from the evidence. I agree that the evidence is pretty thin as to the aggravated part of the aggravated mayhem. But in the end the court believes that one reasonable inference from the evidence is that, since the defendant knew that the complaining witness's eye—of his eye injury, since she had previously tried to attack his eyes knowing that one was weak, when she hit him four to six times in the attack towards his face, one reasonable inference is that she had the requisite mental state for aggravated mayhem. There are certainly other reasonable inferences that could be made from the evidence presented at the preliminary hearing. But the court can make reasonable inferences from the evidence that this was not an indiscriminate attack based on the following: that all four to six blows were to a targeted area, the complaining witness's face; defendant knew that the complaining witness had a previous eye injury; that she tried to attack his eyes previously knowing that one was weak; and she did not stop until the complaining witness's eye was bleeding, that he needed a towel to soak up the blood."

Moqaddem does not mention or challenge this ruling. Though she asserts "Judge Birnstein lacked jurisdiction to add this charge," Judge Birnstein did not add the aggravated

mayhem charge; the People did.  And though Sepe, in a proper motion under section 995, challenged whether the People were entitled to add the aggravated mayhem charge based on the evidence at the preliminary hearing, Judge Burghardt denied the motion, and Moqaddem does not argue Judge Burghardt's order was erroneous.  Moreover, any error in the failure by Halpern, who represented Moqaddem from January 2020 to April 2022, and whom Moqaddem blames for her conviction, to file a motion under section 995 to dismiss the aggravated mayhem charge was harmless because Sepe made the very motion Halpern (and Murphy) did not make, and the court denied it on the merits. (See *People v. Caro* (2019) 7 Cal.5th 463, 497 [to demonstrate ineffective assistance of counsel, the defendant must show prejudice]; *People v. Hart* (1999) 20 Cal.4th 546, 624 ["prejudice must be affirmatively proved"].)  Moqaddem does not argue Halpern, whom she accuses of creating a "chaos and total mess . . . in this case," or Murphy, who had the opportunity to file a motion to dismiss under section 995 but never did before the court removed him for incompetence, would have made a better motion than Sepe.

Finally, even if Moqaddem had challenged the court's order denying her motion under section 995 to dismiss the aggravated mayhem charge, the court did not err in denying it.  The question on a motion under section 995 "is whether 'it appears from the preliminary examination that a public offense has been committed, "and there is sufficient cause to believe the defendant guilty thereof . . . ."  . . .  "'Sufficient cause' . . . means such a state of facts as would lead a man of ordinary caution or prudence to believe and conscientiously entertain a strong suspicion of the guilt of the accused [citation] . . . .'"  [Citation.]  '[E]vidence which

will justify prosecution under the above test need not be sufficient to support a conviction.'" (*People v. Superior Court (Decker)* (2007) 41 Cal.4th 1, 7.) At a preliminary hearing the "magistrate is to decide if there is '"'some rational ground for assuming the possibility that an offense has been committed and the accused is guilty of it.'"'" (*People v. Superior Court (Fernandez)* (2023) 88 Cal.App.5th 26, 31.) Where, as here, the defendant moves to dismiss a count under section 995, "we ask only 'whether the evidence is such that "a reasonable person could harbor a strong suspicion of the defendant's guilt."'" (*People v. Superior Court (Sahlolbei)* (2017) 3 Cal.5th 230, 245.)

The evidence at the preliminary hearing met this "'exceedingly low' standard." (*People v. Superior Court (Sahlolbei), supra*, 3 Cal.5th at p. 245; see *People v. Consiglio* (2022) 86 Cal.App.5th 615, 631.) Section 203, which defines the crime of mayhem, provides: "Every person who unlawfully and maliciously deprives a human being of a member of his body, or disables, disfigures, or renders it useless, or cuts or disables the tongue, or puts out an eye, or slits the nose, ear, or lip, is guilty of mayhem." (See *People v. Romero* (2019) 44 Cal.App.5th 381, 386 ["A member of the body is a general term describing any integral part or vital organ of the body."].) Mayhem is a general intent crime. (*People v. Quarles* (2018) 25 Cal.App.5th 631, 636; *People v. Rodarte* (2014) 223 Cal.App.4th 1158, 1170.) Section 205, which defines the crime of aggravated mayhem, provides in relevant part: "A person is guilty of aggravated mayhem when he or she unlawfully, under circumstances manifesting extreme indifference to the physical or psychological well-being of another person, intentionally causes permanent disability or disfigurement of another human being or deprives a human being

21

of a limb, organ, or member of his or her body." (See *People v. Manibusan* (2013) 58 Cal.4th 40, 86.) For aggravated mayhem the People must prove "'the defendant acted with the specific intent to cause a maiming injury.'" (*Ibid.*; see *People v. James* (2015) 238 Cal.App.4th 794, 811.) The "difference between simple mayhem and aggravated mayhem . . . is the requisite criminal intent"; the "permanent disfiguring injury requirement is the same under each statute." (*People v. Newby* (2008) 167 Cal.App.4th 1341, 1347, 1348.)

Though Pinto refused to testify at the preliminary hearing, he told one of the officers at the hospital (who did testify) that Moqaddem hit him in the eye, that he was "worried about his eye because he had had a past cornea transplant," that Moqaddem knew about his past eye surgeries, and that she had "previously tried to attack knowing" his eyes were weak. From this evidence a reasonable person could have a strong suspicion that Moqaddem, knowing Pinto had vulnerable eyes and having hit him in the eyes multiple times in the past, specifically intended to blind Pinto or permanently disfigure his eyes. She hit Pinto, not in his chest, chin, or ears, but where she knew would likely cause him to lose his eye or his eyesight. The evidence at the preliminary hearing was sufficient to hold Moqaddem to answer to the charge of aggravated mayhem.

B.      *Moqaddem Has Not Shown Her Trial Counsel*
         *Provided Ineffective Assistance*

Moqaddem argues two of the attorneys who represented her in the trial court, Halpern ("mainly") and Sepe (whom she describes as "unauthorized"), provided ineffective assistance of counsel. She contends Halpern, among other things, "conducted

22

zero work" on the case, "engaged in intimidation of his own client at his own residence to abuse and use her at his own home," and failed to review the recordings Pinto made of his phone conversations with Moqaddem.  As for Sepe, Moqaddem argues he "rushed to Trial on such high charges without ever meeting and discussing the case with" her and failed to object during the prosecutor's closing argument, which allowed "defamatory statements and lies to be stated about [Moqaddem] right at the closing statement before the verdict is decided that day . . . ."  In her appeal from the restitution order, Moqaddem argues:  "The records show clearly that Louis Sepe was planted by force by Judge Burghardt to conduct Jury Trial that Sepe was ill prepared for and sabotaged the entire case and life of [Moqaddem]."

Moqaddem forfeited all of these arguments.  She does not cite to the record where this purported conduct occurred.  She does not cite or analyze the law governing ineffective assistance of counsel.  And she does not apply that law to any evidence or statements in the transcripts of the proceedings.  (See *People v. Hoyt, supra,* 8 Cal.5th at p. 939; *People v. Williams, supra,* 16 Cal.4th at p. 206; *People v. Stanley, supra,* 10 Cal.4th at p. 793; *People v. Hardy, supra,* 2 Cal.4th at p. 150; *People v. Lewis, supra,* 111 Cal.App.5th at p. 1098; *People v. Benson, supra,* 110 Cal.App.5th at p. 1078, fn. 2; *People v. Ramirez, supra,* 104 Cal.App.5th at pp. 329-330; *People v. Weber, supra,* 217 Cal.App.4th at p. 1055; *People v. Clayburg, supra,* 211 Cal.App.4th at p. 93; *People v. Johnigan, supra,* 196 Cal.App.4th at p. 1098; *People v. Roberto V., supra,* 93 Cal.App.4th at p. 1364, fn. 6; *People v. Beltran, supra,* 82 Cal.App.4th at p. 697, fn. 5; *People v. Mendoza, supra,* 183 Cal.App.3d at p. 398.)

Moreover, to prevail on an ineffective assistance of counsel claim, the defendant must demonstrate that counsel's performance was deficient and that counsel's deficient performance prejudiced the defendant. "'A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction . . . has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.' [Citation.] Regarding deficient performance, "'Unless a defendant establishes the contrary, we shall presume that 'counsel's performance fell within the wide range of professional competence and that counsel's actions and inactions can be explained as a matter of sound trial strategy.'" [Citation.] When the record on direct appeal sheds no light on why counsel failed to act in the manner challenged, defendant must show that there was ""no conceivable tactical purpose'" for counsel's act or omission."'" (*People v. Aguirre* (2025) 18 Cal.5th 629, 679.)

Moqaddem has made neither of these showings. Halpern, who represented Moqaddem from January 2020 (after Feldman) to April 2022, filed a motion to disqualify the district attorney, a motion under section 995 to dismiss the simple mayhem count, appeared and represented Moqaddem at numerous court hearings and bail reviews, requested discovery on the new charges in the second amended information, expressed a doubt under section 1368 regarding Moqaddem's competence to stand

24

trial, explored mental health diversion for Moqaddem, obtained and reviewed discovery, and tried to negotiate a plea agreement that included probation.  There is no evidence Halpern's performance was so deficient he was not functioning as Moqaddem's attorney.[16]  Moqaddem does not cite anything in the record Halpern did wrong (she does not cite anything in the record).

As for Sepe's failure to object to statements by the prosecutor during closing argument, Moqaddem does not state what those statements were or what valid objections Sepe could have made.  Where, as here, "'"'the record on appeal sheds no light on why counsel acted or failed to act in the manner challenged[,] . . . unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation,' the claim on appeal must be rejected."'" (*People v. Barrett* (2025) 17 Cal.5th 897, 969.)  "This rule 'is particularly apt' where, as here, 'the asserted deficiency arises from defense counsel's failure to object.  "[D]eciding whether to object is inherently tactical, and the failure to object will rarely establish ineffective assistance."'" (*People v. Arredondo* (2019) 8 Cal.5th 694, 711; see *People v. Washington* (2017)

---

[16]    Which is not to say Halpern did not make mistakes.  In April 2022 he moved to withdraw as Moqaddem's counsel, admitting he had sexual relations with Moqaddem in late 2020.  Moqaddem did not think there was a conflict and she did not want Halpern to withdraw.  She stated:  "I've always spoken highly of Mr. Halpern."  Halpern, however, said he felt he had to withdraw because he had received threats from Murphy and others that Moqaddem might sue him.  Judge Birnstein relieved Halpern, but stated, "This is not a *Marsden* hearing any longer.  This is very different," and reported Halpern to the State Bar.

15 Cal.App.5th 19, 25 ["It is especially 'difficult' to prove ineffective assistance 'on direct appeal' because courts 'presum[e] that counsel's actions' are reasonable and because the 'record on appeal may not explain why counsel chose to act as he or she did.'"].)

We cannot evaluate whether the record sheds light on why Sepe may have decided not to object to the prosecutor's closing argument or whether the prosecutor misstated the law or facts because Moqaddem has not identified where in the record the prosecutor made defamatory statements about her or misstated the evidence, or even what those statements were. Sepe may well have decided not to object because the prosecutor's comments, whatever they were, fell within the "wide latitude" prosecutors have "during closing argument to comment on the evidence or draw reasonable inferences from it." (*People v. Parker* (2022) 13 Cal.5th 1, 79.) Therefore, her "ineffective assistance of counsel claim predicated on the failure to object to [the prosecutor's alleged] misconduct fails." (*People v. Turner* (2004) 34 Cal.4th 406, 431.)

Finally, Moqaddem had not shown anything Halpern or Sepe did or failed to do prejudiced her case. She complains they did not do enough work on the case and did not review Pinto's recordings of his conversations with Moqaddem. But Halpern ceased representing Moqaddem in April 2022, leaving plenty of time for Moqaddem's subsequent lawyers (including Murphy, from May 2022 to March 2023, and Sepe, from September 2023 through trial in February 2024) to do whatever they believed needed to be done to prepare for trial, including reviewing Pinto's

26

recordings of his telephone calls with Moqaddem.[17] And though there is no evidence when Sepe reviewed the recordings (Moqaddem cites no evidence to support her claim he failed to review them), he was sufficiently familiar with them at trial to cross-examine Pinto about them extensively. For example, Sepe got Pinto to admit that in one of the calls Moqaddem told him to testify about anything he wanted to and to let the jury decide, that some of the statements he made on the tapes were untrue, that Pinto would be able to use the recordings in his civil action against Moqaddem, and that Pinto deleted some of the recordings. Moqaddem has not shown that, if Halpern or Sepe had done any of the things she asserts they should have done, the result of the trial would have been any different. (See *People v. Mickel* (2016) 2 Cal.5th 181, 198 ["To demonstrate prejudice, defendant bears the burden of showing a reasonable probability that, but for counsel's deficient performance, the outcome of the proceeding would have been different."].)

C. *Moqaddem Has Not Shown Any Error in Jury Selection*

Moqaddem argues that the trial court deprived her of her right to an impartial jury of her peers because the jurors "were handpicked to be all linked to Law firms, police officers' relatives and District attorneys' relatives." Moqaddem also asserts "one of the Jurors was eliminated by Sepe on Friday Afternoon final day

---

[17] The People gave the defense a copy of the recordings no later than April 2022.

27

of Jury selection, but somehow returned on Monday to serve as one of the Jurors."

Moqaddem forfeited these arguments. She does not cite to information in the record about the prospective jurors, their employment, or their relationships or experiences with law enforcement or lawyers. She does not present any analysis or citation to authority to support her claim of impropriety in jury selection. She does not cite any statements by the prospective jurors during voir dire that indicate any of them could not be fair or impartial. And while empaneling a juror who been excused would be irregular, Moqaddem does not cite anything in the record suggesting that occurred.

Jury selection occurred on Wednesday, January 31, 2024 (hardship), Thursday, February 1, 2024, and the afternoon of Friday, February 2, 2024. The court clerk swore in a panel of 12 jurors and four alternate jurors on that Friday. When trial resumed Monday, February 5, 2024, the trial court denied a defense motion to continue the trial, granted a motion by the People to admit Pinto's recordings of his telephone calls with Moqaddem, held a hearing under Evidence Code section 402, and ruled on the admissibility of evidence regarding the purchase of a car Moqaddem claimed she bought and complaints to the State Bar about Pinto. Then the jurors entered the courtroom, counsel made opening statements, and the People called their first witness, Pinto. Later the court held another hearing on the admissibility of evidence Pinto solicited Moqaddem as a client at a courthouse. There was no mention of or indication any of the excused jurors were sitting on the panel or as alternate jurors. At one point Sepe asked the court to inquire about an individual in the audience who had been observing the proceedings. The

28

court asked the individual if he was a witness in the case, the man stated he was not, and the court said he could sit and watch the trial.

D. *Moqaddem Has Not Shown Any Error in Her Sentence*

As stated, the trial court sentenced Moqaddem to a prison term of two years, plus life with the possibility of parole.  In challenging her sentence Moqaddem argues (1) the trial judge "signaled to his Deputy to move the notes from [her] hand who was deprived from reading her notes for the records"; (2) the sentencing hearing "took place without her presence"; (3) the court relied on a "probation false report" that "had absolutely nothing to do with this case, is not even signed by any probation officer, is outdated to 2017, is false on its face and not stamped by the court nor any Judge, and somehow ended up part of the records in this case"; and (4) "there was no mention at all by Sepe, nor the court and DA, that as a matter of evidence [Moqaddem] was already pre punished because of this case . . . for 4 years jail time that she already served in 2018, that consisted of 3 years jail time, plus 1 year jail time of 54 weeks Domestic Violence Classes . . . ."  These arguments, to the extent we can understand them, lack merit.

As a preliminary matter, Moqaddem does not cite to the record where the trial court, the prosecutor, or defense counsel did or failed to do any of the things she asserts occurred.  She does not present any legal argument, citations to authority, or citations to the record that the court directed the courtroom deputy to take any actions, that the sentencing hearing occurred in her absence, that the court relied on a probation report from

29

another case (let alone a false one), or that she was inappropriately punished for her convictions. Therefore, as with her challenges to her convictions, Moqaddem's challenges to her sentence are all forfeited.

Moqaddem's arguments also fail on the merits. At the sentencing hearing (which began with a hearing on Moqaddem's motion for a new trial) Moqaddem, though represented by counsel, interrupted the proceedings and made long speeches about the merits of her convictions (as she had throughout the trial). The trial court patiently allowed Moqaddem to make statements and arguments that essentially sought to relitigate the trial. At one point, after Moqaddem had been speaking for some time, the trial court said to her, "If you don't stop talking, I'm going to exclude you from the courtroom. I'll give you five more minutes. But I'm telling you, you have to be done in five minutes." After allowing Moqaddem to speak for an additional period of time, the court stated: "Ma'am, we need to proceed, okay? I've given you ample time. You can put everything else in your appeal. So we're going to go forward with the [motion for new trial] now." Moqaddem stated that she did not authorize Sepe to file a motion for a new trial and that "the deputy is touching my paper." The court stated: "Ma'am, if you don't stop talking, I'm going to have to exclude you from the courtroom and sentence you without you being present. I don't want to do that, but you need to stop talking. I've given you an opportunity to speak. Now you have to let everyone else speak."

After the court denied the motion for new trial, while Pinto was making his victim impact statement, and after the court asked someone in the courtroom affiliated with Moqaddem to stop recording the proceedings, Moqaddem interrupted again.

The court stated, "Alright, Ma'am.  If you continue to speak, I'm going to have to exclude you."  Moqaddem interrupted the court again.  The trial court then excluded Moqaddem from the courtroom.

The record reflects (at most) the courtroom deputy touched Moqaddem's notes, not that the deputy took her notes from her.  And even if the deputy had taken her notes, she did not need them for the rest of the hearing because the trial court was forced to remove her from the courtroom for refusing to control her behavior.  And though removing a defendant from the courtroom is an extreme measure, Moqaddem does not explain why the trial court abused its discretion in removing her from the courtroom under the circumstances.  (See § 1043, subd. (b)(1) [trial court may remove a defendant from the courtroom where "the defendant, after being warned by the judge that they will be removed if they continue their disruptive behavior, nevertheless insists on acting in a manner so disorderly, disruptive, and disrespectful of the court that the trial cannot be carried on with the defendant present in the courtroom"]; *People v. Carson* (2005) 35 Cal.4th 1, 9 ["a defendant represented by counsel may be removed from the courtroom for disruptive behavior"]; *People v. Medina* (1995) 11 Cal.4th 694, 737 ["an *unduly disruptive* defendant, after being warned, may be removed from the courtroom until he 'reclaims' his right to be present by expressing his willingness to conduct himself properly"].)

On whether the trial court relied on a false probation report, the only mention of probation at the sentencing hearing was when the court, in imposing (and staying under section 654 execution of) the middle term of two years (rather than the lower term) on her conviction for attempting to bribe a witness, stated

31

Moqaddem was on probation at the time she committed the crimes in this case and that her performance on probation was unsatisfactory.  Moqaddem was in fact on probation for a 2017 conviction for taking, keeping, or concealing a child and maliciously depriving a lawful custodian of a right to custody or visitation, in violation of section 278.5.  The trial court did not err in considering that factor in imposing the middle term on that conviction.  (See Cal. Rules of Court, rule 4.421(b)(4) & (5).)

Finally, regarding whether Moqaddem had been inappropriately punished or "pre-punished" for her convictions in this case, the court stated, for each conviction, what term the court was imposing, the reasons for its discretionary choices, and whether each term was consecutive, concurrent, or stayed under section 654.  (See *People v. Ramirez* (2021) 10 Cal.5th 983, 1042 ["Absent evidence to the contrary, we presume that the trial court knew the law and followed it."]; *People v. Gutierrez* (2014) 58 Cal.4th 1354, 1390 ["Absent evidence to the contrary, we presume that the trial court knew and applied the governing law."].)  For most of Moqaddem's convictions (the court dismissed her conviction for simple mayhem as a lesser included offense), the court imposed a concurrent term or stayed execution of sentence under section 654.  The court awarded her 1,049 days (more than two and a half years) of actual and conduct credit.  It is hard to discern what Moqaddem is claiming the court did wrong.  She states: "The time served prior sentencing is doubled in time of 16 months total, plus four years and four months jail time as of April 11, 2024, that is not what was stated by State Court Judge, of only three years jail time falsely stated to have been served, that is another fatal and gross error by State Court to cheat [Moqaddem] of and [*sic*] entire additional 2 years and

4 months served in this case as of April 11, 2024." But it's not clear what that means.

E.	*Moqaddem Has Not Shown Any Error in the Restitution Award*

Moqaddem challenges the court's order requiring her to pay Pinto $188,057.86 in victim restitution and $70,000 to the California Victim Compensation Board. She contends: "This Appeal is based in absolute ineffective counsel, violation of clear conflict of interest between the entire LACBA with Louis Sepe who are not authorized by matter of Law to pose by force or by any other as counsels of [Moqaddem] from Lawsuits filed against them by [Moqaddem] and serious complaints, that also causes a clear conflict of interest." And: "The conduct of Sepe was outrageous, unheard of before in any court system that is determined by the facts that no one can dispute. Any decent and honest Attorney would have objected and refused to participate at a hearing on restitution when he is not authorized by the client to do so and when there a clear conflict of interest. Sepe has done just the opposit [*sic*] to cause further harm and damage to [Moqaddem]. His actions were willful, intentional, deliberate, malicious and vindictive."

Moqaddem again forfeited her contentions by failing to present a coherent argument, cite to the record, or cite to relevant authority. Though Moqaddem cites a case, *Culpepper v. Pearl Street Bldg., Inc.* (Colo. 1994) 877 P.2d 877, it has no relevance to the issues in this appeal.[18] Her contentions are also meritless:

---

[18]	In *Culpepper* the Colorado Supreme Court held parents of an adult son could not maintain an action for (Colorado's

33

Sepe was appointed by the court to represent Moqaddem after Murphy was removed for incompetence. Sepe represented Moqaddem at the restitution hearing, cross-examined Pinto, and successfully argued the court should not award some of the items Pinto claimed as restitution.

Moqaddem also argues (more or less) the evidence at the restitution hearing did not support the award. She contends: "Without actual damages documented with medical records and photos of injury at the date it was issued and the financial hardship caused by Pinto to [Moqaddem] and the massive theft of over $400,000 by Pinto of [Moqaddem's] valuable jewelry and property, his criminal trespassing should not have awarded this substantial amount to Pinto, and this hearing should not have taken place without the attorney of record in this case. Only nominal damages could have been awarded." Moqaddem forfeited this argument, too, by failing to present it cogently and with citations to authority and the record.

Moqaddem is also incorrect. Under section 1202.4, subdivision (f), "[w]hen a crime victim has suffered an economic loss because of the defendant's conduct, the trial court must order full restitution to the victim. [Citation.] Courts broadly construe the right to restitution. [Citation.] We review a restitution order for abuse of discretion, and we must uphold the amount of restitution if there is a factual and rational basis for it." (*People v. Anderson* (2025) 110 Cal.App.5th 1256, 1260.) "'"[W]here the specific issue is whether the court's factual findings support

___

equivalent of) intentional infliction of emotional distress against a crematorium that had mistakenly cremated the wrong body. (*Culpepper v. Pearl Street Bldg., Inc.*, *supra*, 877 P.2d at pp. 878-879.)

34

restitution, we review those findings for substantial evidence.""" (*People v. Plains All American Pipeline, L.P.* (2024) 101 Cal.App.5th 872, 885-886.)

At the restitution hearing Pinto described the expenses he incurred as a result of Moqaddem's crimes. He testified his claimed restitution amounts included $30,000 for the lost corneal transplants, $28,268.29 in hospital expenses, $15,165 in physician charges from his treatment in the hospital, $1,605.57 in follow-up medical appointments and procedures, $100,000 in lost wages when he was unable to work after the incident, $5,700 for a prosthetic eye, and $1,296 in counseling (16 sessions), some of which was paid by the California Victim's Compensation Fund. Pinto provided receipts and other documentation to support his claim for restitution. Substantial evidence supported the trial court's findings, and the court did not abuse its discretion in ordering Moqaddem to pay victim restitution.

Finally, Moqaddem states the restitution hearing "should not have taken place without the attorney of record." At the restitution hearing, after filing another motion to disqualify Judge Burghardt, Moqaddem stated she had filed a substitution of attorney to substitute Murphy for Sepe, and Sepe said he had received a substitution of attorney naming Murphy as Moqaddem's attorney. The court pointed out, however, that Murphy had been removed from the case and that the court would not permit Murphy to substitute back in as Moqaddem's attorney. The court also observed Murphy was not present in court for the restitution hearing.[19]

---

[19] Moqaddem suggests she was "deprived of her right to at a minimum be able to represent herself at this hearing that she

## DISPOSITION

The judgment and restitution orders are affirmed.


                                          SEGAL, J.

We concur:



        MARTINEZ, P. J.



        STONE, J.

---

has every right to do, but was deprived from that too."
Moqaddem, however, did not move to represent herself at the
restitution hearing, though during the trial the court had denied
such a motion.  Moqaddem walked out of the courtroom and
voluntarily absented herself from the restitution proceedings
before Pinto testified.